IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| CHRISTOPHER MICHAEL RICHARDSON,  Plaintiff,  v.  SHERIFF DAVID DAVIS, *et al.*,  Defendants. | CIVIL ACTION NO. 5:20-cv-320 (MTT) |

## ORDER

Defendants Sheriff David Davis and Sherriff's deputies Derrick Stokes, Lawrence Prichard, Anthony Sims, Devin Keith, Robert Perry, Adam Butcher, Elson Odle, Richard McClendon, Gregory Mays, and Derek Vickery (the "individual deputies") have moved for summary judgment on Plaintiff Christopher Michael Richardson's claims.[1]  For the following reasons, the defendants' motion (Doc. 39) is **GRANTED**.

## I. BACKGROUND[2]

Richardson was arrested by the Bibb County Sheriff's Office ("BCSO") on July 18, 2019 for making terrorist threats and was booked into the Bibb County Law

---

[1] Macon-Bibb County and Mayor Robert Reichert have also moved for summary judgment on Richardson's claims.  Doc. 36.  In his response to that motion, Richardson "acknowledges that Macon-Bibb County and Mayor Reichert are not proper Defendants to this suit."  Doc. 41 at 1.  Thus, Richardson does not oppose dismissal of his claims against those defendants, and their motion for summary judgment (Doc. 36) is **GRANTED**.  The Court is concerned that Richardson made this concession only after Macon-Bibb County and the Mayor moved for summary judgment.

[2] Richardson failed to file a separate statement of material facts to which he contends there exists a genuine dispute to be tried as required by Local Rule 56.  Nonetheless, unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Enforcement Center (the "LEC"), where he remained until March 10, 2020.  Docs. 39-2 ¶¶ 5, 13; 40-1 ¶¶ 5, 13.  A few weeks before he was arrested, Richardson injured the small finger on his left hand in an altercation.[3]  Docs. 39-2 ¶ 5; 40-1 ¶ 5.  This injury, as well as a wound from a recent surgery on his Achilles tendon, was identified by a CorrectHealth nurse during Richardson's initial medical screening at the LEC.  Doc. 39-5 at 4.  According to the record, Richardson raised no complaints then about his finger.  CorrectHealth is a private corporation that provides inmate healthcare at the LEC; BCSO employees do not treat inmates, operate the infirmary, or make medical decisions.  Docs. 39-2 ¶¶ 3-4; 40-1 ¶¶ 3-4.  BCSO employees do, however, transport inmates to off-site medical appointments and can cancel those appointments in certain circumstances, such as when a staffing shortage prohibits off-site transportation.  Docs. 40-2 at 47:10-48:15; 53:2-54:9; 40-3 at 53:2-51:21.  If an off-site medical appointment is cancelled, BCSO employees ask CorrectHealth employees to reschedule the appointment.  Doc. 40-2 at 47:20-49:16.

Richardson first complained about his finger on August 5, 2019, when he told CorrectHealth employees that the finger ached and throbbed with pain.  Docs. 39-2 ¶ 6; 40-1 ¶ 6.  Two days later, CorrectHealth employees x-rayed his finger, revealing "displaced chip fractures at the base of the distal phalanx with distal flexion deformity demonstrated."  Docs. 39-2 ¶ 7; 40-1 ¶ 7.  On August 13, Richardson again informed CorrectHealth employees about pain in his finger, and a CorrectHealth doctor noted that

---

[3] Richardson contradicted himself multiple times about how he injured his finger.  In his deposition, Richardson explained in detail that he injured his finger after slipping on sewage water in his cell.  Doc. 40-5 at 44:3-9, 92:21-93:18.  But Richardson told a medical professional at the LEC that he injured his finger when he fell in the shower.  Doc. 39-5 at 19.  Richardson now admits, however, that he injured his finger on June 28, 2019 before he was arrested.  Docs. 39-2 ¶ 5; 40-1 ¶ 5.

Richardson needed to be seen by an orthopedist.  Docs. 39-2 ¶¶ 8-9; 40-1 ¶¶ 8-9; 39-5 at 19.  On August 21, CorrectHealth employees scheduled Richardson to see an orthopedic surgeon at OrthoGeorgia, an off-site medical provider, for an evaluation on August 27, 2019.  Docs. 39-2 ¶ 10; 40-1 ¶ 10.  But Richardson missed that appointment, and on September 3, the appointment was rescheduled for September 9.  The parties do not explain why Richardson missed the August 27 appointment, but evidence suggests that mistaken identity, by whom the record does not reveal, is to blame.[4]  There is no evidence that any defendant was responsible for the missed appointment.  Whatever the reason for the missed appointment, Richardson was seen by the surgeon at OrthoGeorgia on September 9.  Docs. 39-2 ¶ 11; 40-1 ¶ 11.  On September 23, OrthoGeorgia scheduled Richardson to undergo surgery on October 21.  Richardson asserts that because of the delay in treatment, he was required to undergo a second surgery in February 2020 and has not regained full mobility of his finger.  Doc. 40 at 6.  Other than Richardson's bare assertion, there is no evidence that the 13-day delay from the missed appointment caused Richardson further injury.[5]

Richardson filed an amended complaint on October 7, 2020, alleging multiple claims, but in his response to the defendants' motion for summary judgment he clearly abandons all claims except a claim for deliberate indifference to medical needs against

---

[4] Another LEC detainee, Christopher *Rayshawn* Richardson, was arrested the month after Plaintiff Christopher *Michael* Richardson.  Doc. 39-4 ¶ 11.  Prior to his arrest, Christopher Rayshawn Richardson injured the ring finger on his right hand, and it appears that he was taken to OrthoGeorgia on August 27, 2019 when Christopher Michael Richardson, who was housed only one cell away, was supposed to go.  Doc. 39-4 ¶ 11; *Christopher Rayshawn Richardson v. Macon-Bibb County*, 5:20-cv-322-TES, Docs. 27-3 ¶ 8; 31-1 ¶ 8.  Further, both men retained the same attorneys and have brought nearly identical lawsuits.

[5] Richardson's surgeon did testify that the delay between when the injury occurred—June 28, 2019—and the first surgery could have made it more difficult for the finger to heal, but he did not specify that the delay of less than two weeks—the only delay Richardson attributes to the defendants—necessitated the second surgery or complicated Richardson's recovery.  Doc. 40-4 at 30:21-24.

Sheriff Davis—whether in the Sheriff's official or individual capacity the response does not say—and *perhaps* the individual deputies. See Docs. 11 ¶¶ 37-71; 40 at 3-12. Richardson admits that CorrectHealth—not Sheriff Davis or any of his deputies—schedules medical appointments and that his medical needs, while serious, did not constitute an emergency. Docs. 39-2 ¶¶ 3-4; 40-1 ¶¶ 3-4; 40 at 4, 12. However, Richardson maintains that BCSO employees are "authorized to do one thing—cancel or postpone scheduled medical care for a variety of reasons." Doc. 40 at 4. Thus, the crux of Richardson's theory appears to be that it is a violation of his constitutional rights for BCSO employees to cancel or postpone non-emergency medical appointments. But again, there is no evidence, or even argument, that the defendants cancelled any of Richardson's medical appointments. See Doc. 40. In fact, there is practically no evidence or argument by Richardson concerning what the defendants did or didn't do.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

**A. Eleventh Amendment Immunity Bars Richardson's Official Capacity Claims.**[6]

Richardson brought this lawsuit against the defendants in their individual and official capacities. *See* Docs. 11 at 1; 40 at 1 n.1. The defendants argue that Eleventh Amendment immunity entitles them to summary judgment from any official capacity claims because they were acting as an arm of the state while administering the LEC. Doc. 39-1 at 7-8.

The Eleventh Amendment bars federal courts from entertaining suits against states without the state's consent. U.S. Const. Amend. XI. Eleventh Amendment immunity acts as a limitation on the federal judiciary's Article III powers and protects a state's treasury from claims for damages brought by private entities in federal court. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Alden v. Maine*, 527 U.S. 706, 716-21 (1999). A suit against a state official in his official capacity is in reality a suit against the official's office. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Richardson does not respond to the defendants' Eleventh Amendment argument and has thus abandoned his official capacity claims. In fact, Richardson admits that Sheriff Davis was acting "as an arm of the State of Georgia; and in accordance with the duties imposed upon him and pursuant to the authority vested in him by the Georgia Constitution, Georgia statutes, and other applicable law." Docs. 39-2 ¶ 1: 40-1 ¶ 1. It is

---

[6] It is not just the Eleventh Amendment that bars § 1983 claims for damages against sheriffs in their official capacity. States—and, by extension, arms of the state—are not "persons" within the meaning of § 1983. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989). And § 1983 subjects only "persons" to monetary liability for violations of constitutionals rights. But the questions of whether Sheriff Davis and his deputies are "persons" subject to § 1983 and whether they are entitled to Eleventh Amendment immunity both turn on whether they were functioning as an arm of the state when they operated the LEC. *United States ex rel. Lesinski, v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 606 n.9 (11th Cir. 2014).

well and long settled that a sheriff and his deputies act as an arm of the state when operating a county jail.  *Manders v. Lee*, 338 F.3d 1304, 1319 (11th Cir. 2003). Accordingly, Richardson's official capacity claims against Sheriff Davis and his deputies are barred by Eleventh Amendment immunity.

### B. Richardson's Deliberate Indifference Claim Fails

The defendants argue they are entitled to qualified immunity from Richardson's deliberate indifference claim.  It is not clear why, at the summary judgment stage, they argue qualified immunity rather than directly challenging the merits of Richardson's claim.[7]  They move only on the constitutional violation prong of the qualified immunity analysis; they do not argue the absence of clearly established law.  Richardson too focuses on whether the defendants were subjectively aware of and deliberately indifferent to his serious medical needs.[8]  In other words, with a fully developed record, the defendants' motion really attacks the merits of Richardson's deliberate indifference claim.  Still, technically, the motion is one for qualified immunity.

The defendants argue that Richardson has not shown a violation of his constitutional rights.  Doc. 39-1 at 10-12.  Specifically, they argue that Richardson has not established that the defendants delayed medical treatment or that the defendants

---

[7] Perhaps the defendants wished to retain their right of interlocutory appeal.  *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

[8] Richardson was a pretrial detainee.  Accordingly, the Court interprets Richardson's claim for deliberate indifference to serious medical needs as one brought pursuant to the Due Process Clause of the Fourteenth Amendment, despite Richardson bringing this claim pursuant to the Eighth Amendment.  *See Cagle v. Sutherland*, 334 F.3d 980, 985-86 (11th Cir. 2003).  Claims for deliberate indifference to serious medical needs are analyzed under the same standard regardless of whether they are brought pursuant to the Eighth or Fourteenth Amendment.  *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001).  Richardson originally plead a Fourteenth Amendment claim, but under the Equal Protection Clause.  Doc. 11 ¶¶ 63-68.  That claim, which alleged Richardson received worse medical care than similarly situated inmates, is one of the many claims that Richardson has abandoned.

were subjectively aware of his serious medical needs. A detainee's Fourteenth Amendment right against cruel and unusual punishment includes the right to be free from deliberate indifference to serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and subjective inquiry." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Regarding the objective component, Richardson must prove an objectively serious medical need that, if left unattended, poses a substantial risk of serious harm. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). With respect to the subjective component, to survive summary judgment, Richardson must produce evidence of: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."[9] *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Finally, as with any tort claim, Richardson must show that an injury was caused by the prison official's wrongful conduct. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

Richardson has not sued CorrectHealth or OrthoGeorgia, and he admits that the defendants' only duty concerning inmates' off-site medical appointments is to provide transportation. Docs. 39-2 ¶ 3; 40-1 ¶ 3. Accordingly, Richardson's claim focuses solely on the defendants' ability to cancel his off-site medical appointments, not the quality of the care he received. *See* Doc. 40 at 4, 9-11.

Richardson relies on the following facts:

> When Mr. Richardson was first booked into the Bibb County Sheriff's Department on or around July 18, 2019, he underwent an initial medical intake by a CorrectHealth employee. During this intake, Mr. Richardson

---

[9] Factors to consider in deciding whether a delay in medical care is "more than gross negligence" include "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007).

> informed the CorrectHealth employee that he had injured the small finger on his left hand.  On or around August 13, 2019, Mr. Richardson met with Dr. Vlasenko with CorrectHealth.  During this appointment, Dr. Vlasenko noted that Mr. Richardson had a left pinky fracture and referred Mr. Richardson to orthopedics.  On or around August 21, 2019, CorrectHealth scheduled an appointment for Mr. Richardson with OrthoGeorgia for August 27, 2019.  However, Mr. Richardson's appointment was then rescheduled for September 9, 2019, almost a month after Dr. Vlasenko discovered that Mr. Richardson had a fractured finger and almost two months after Mr. Richardson first reported having issues with his finger.  When Mr. Richardson was finally able to attend an appointment with OrthoGeorgia, Dr. Sapp noted that Mr. Richardson [sic] finger would require surgical correction. … Following Mr. Richardson's initial consult with OrthoGeorgia on September 9, 2019, it was almost another month until Mr. Richardson attended his preop on October 14, 2019. … Mr. Richardson was finally able to have surgery to repair his finger on October 21, 2019.

Doc. 40 at 5-6 (citations omitted).  Based on these facts, Richardson concludes that "by failing to ensure that Mr. Richardson got the medical attention that he needed, and that was later ordered by a physician, Defendants should be liable for their deliberate indifference to Mr. Richardson's medical needs."[10]  *Id*. at 7.

First, Richardson does not point to a single medical appointment that was cancelled or postponed *by the defendants*.  The only relevant appointment Richardson appears to have missed was on August 27, 2019 (which was promptly rescheduled for September 9), but Richardson does not cite to any evidence tending to establish that this appointment was cancelled by a BCSO employee, much less one of the defendants.  Richardson offers no evidence or argument about why the August 27

---

[10] By jumping to this conclusion, Richardson appears to argue that anytime an off-site medical appointment is cancelled, postponed, or delayed, a prison official has been deliberately indifferent.  Doc. 40 at 4 (stating that because deputy sheriffs can cancel or delay non-emergency off-site medical appointments, "this decision necessarily results in the denial of medical care").  But delays in non-emergency medical care must be analyzed in the context of the nature of the medical need and the reasons for the delay.  *Farrow*, 320 F.3d at 1247.  In other words, this analysis is very fact specific.  But the Court need not wade into these waters because Richardson does not point to a specific delay caused by the defendants or argue that any defendants were subjectively aware of his medical needs.

appointment was missed; he merely states that it was rescheduled for September 9 by CorrectHealth. Doc. 40 at 6. And the CorrectHealth records Richardson cites are similarly silent as to the cause of the missed appointment. Doc. 39-5 at 62.[11] Without evidence that any of his medical appointments were cancelled by the defendants, Richardson's deliberate indifference claim based on the cancellation of medical appointments fails.

Richardson also has not come forward with evidence that any of the defendants were subjectively aware of his serious medical needs. In fact, Richardson fails to mention any of the individual deputies *at all* in his brief, and he admits that he never encountered or interacted with Sheriff Davis. Docs. 39-2 ¶ 2; 40-1 ¶ 2. Perhaps the individual deputies were not mentioned because they were named in this lawsuit in connection to a claim that has since been abandoned. *See* Doc. 40-5 at 84:3-11 (stating the individual deputies were named in this lawsuit because of their knowledge of Richardson's cell flooding, not in connection with delayed medical treatment). In any event, there is no evidence that any of the defendants were subjectively aware of Richardson's serious medical needs. *See Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010); *Goebert*, 510 F.3d at 1326 (a plaintiff must show that an official was subjectively aware of a risk of serious harm and that the official disregarded that risk).

---

[11] A CorrectHealth record entry on August 21, 2019 states: "Received return call from GA Ortho and Hand Center. Appointment scheduled with Dr. Sapp on 8/27/19 for evaluation of finger fracture." Doc. 39-5 at 62. The next CorrectHealth entry, dated September 3, 2019, states: "Appointment rescheduled with Dr. Sapp on 9/9/2019." *Id*.

In conclusion, Richardson has failed to come forward with evidence that the defendants cancelled or postponed his off-site medical appointment, and he also has failed to come forward with evidence that any of the defendants were subjectively aware of his serious medical needs.  Accordingly, the defendants' motion for summary judgment on Richardson's claim for deliberate indifference to medical needs is **GRANTED**.

## C.  Richardson's Supervisory Liability and Failure to Train Claims Fail

It is well established that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cnty., Ga*., 749 F.3d 1034, 1047 (11th Cir. 2014) (citations omitted).  "Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."  *Id*.  "The necessary causal connection can be established when a history of widespread abuse puts the reasonable supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.  Alternatively, the causal connection may be established when a supervisor's custom or policy results in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so."  *Id*. (cleaned up).

Similarly, to succeed on a § 1983 failure to train claim, a supervising official is only liable when "his failure to train amounts to deliberate indifference to the rights of persons with whom the subordinates come into contact and the failure has actually

caused the injury of which the plaintiff complains." *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397 (11th Cir. 1994).  In a failure to train case, a plaintiff "must demonstrate that the supervisor had 'actual or constructive notice that a particular omission in their training program caused his employees to violate citizens' constitutional rights' and that armed with that knowledge the supervisor chose to retain that training program." *Keith*, 749 F.3d at 1052 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "To establish that supervisor was on actual or constructive notice of the deficiency of training, '[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary.'" *Id*. at 1053 (quoting *Connick*, 563 U.S. at 70).

Richardson argues that his constitutional rights were violated because Sheriff Davis's policy allowed deputies to cancel off-site medical appointments under some circumstances.  Doc. 40 at 9-10 ("Arguably, Sheriff Davis' policy of allowing his employees to cancel or postpone medical appointments is, in and of itself, one that has resulted in Sheriff Davis' deliberate indifference to the serious medical needs of inmates.").  Richardson also argues that Sheriff Davis is liable as a supervisor because he was on notice of a widespread abuse of constitutional rights.  *Id*.  Finally, Richardson argues that Sheriff Davis can be liable for his failure to properly train and supervise his deputies.  *Id*. at 10-12.

Richardson's kitchen-sink attack on Sheriff Davis is a non-starter for the same reasons his underlying deliberate indifference claim fails—he has not pointed to evidence that any of Sheriff Davis's subordinates were subjectively aware of his serious medical needs or that they cancelled or postponed his off-site medical appointments.  Because supervisory liability claims and failure to train claims fail absent a violation of

the plaintiff's constitutional rights by a subordinate, Richardson's claims against Sheriff Davis fail.[12]  *See Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007).

But even if the Court assumes that one of Sheriff Davis's subordinates cancelled Richardson's off-site medical appointment, Richardson has no evidence tending to establish that it was cancelled because of Sheriff Davis's policy.  Sheriff Davis's policy, according to Richardson, is that deputies may cancel off-site medical appointments when there is a staffing shortage or other situation that prohibits deputies from leaving the LEC.  Doc. 40 at 9.  But Richardson has not pointed to evidence that his appointment was cancelled for any of these reasons.

Richardson also has not pointed to evidence tending to establish that Sheriff Davis was aware of a widespread abuse of constitutional rights resulting from his policy.  The only incident Richardson cites to show that other detainees or inmates missed their off-site medical appointments is one involving Christopher *Rayshawn* Richardson, who was not seen until 51 days after an initial appointment when his doctor had ordered a seven-day follow-up appointment.  Doc. 40 at 10.  But again, Richardson does not argue that Christopher Rayshawn Richardson's appointment was cancelled by a BCSO employee pursuant to Sheriff Davis's policy.  Moreover, Christopher Rayshawn Richardson's delayed appointment was *after* Plaintiff Richardson missed his appointment on August 27, and thus Richardson cannot rely on it to establish that Sheriff Davis was aware of a widespread abuse of constitutional rights.  *Id*.  Finally, a single similar incident is insufficient to establish a pattern of constitutional violations to

---

[12] It is conceivable that a policy itself could cause a constitutional violation in the absence of a subordinate's unconstitutional violation, but not here.  Richardson's claim is that the policy, which is not unconstitutional on its face, was applied by someone in a way that resulted in a constitutional violation.

hold Sheriff Davis liable under theories of supervisory liability or failure to train. *See Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) ("The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.") (quotation omitted); *see also Keith*, 749 F.3d at 1053 (stating a pattern of similar constitutional is necessary to establish deficient training).

Accordingly, the defendants' motion for summary judgment as to Richardson's supervisory liability and failure to train claims is **GRANTED**.

### IV. CONCLUSION

In conclusion, Richardson argues that BCSO employees were deliberately indifferent to his medical needs because of a policy that allows them to cancel or postpone inmates' non-emergency medical appointments in some situations. But Richardson has not come forward with evidence that any of his medical appointments were cancelled by BCSO employees or that any BCSO employees were aware of his medical needs. Further, Richardson has not shown that his injury was caused by Sheriff Davis's policy or that Sheriff Davis was aware of widespread constitutional deprivations caused by his policy or by a failure to train his subordinates. Accordingly, the defendants' motion for summary judgment (Doc. 39) is **GRANTED**.

**SO ORDERED**, this 7th day of July, 2022.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT